**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ACCLAIM SYSTEMS, INC.,** | : | **CIVIL ACTION** |
| *Plaintiff*, | : | |
| | : | |
| **v.** | : | |
| | : | |
| **INFOSYS, LTD., et al,** | : | **No. 13-7336** |
| *Defendants*. | : | |

**M E M O R A N D U M**

PRATTER, J.                                                        MARCH 11, 2016

Acclaim Systems, Inc. ("Acclaim") alleges that Infosys, Ltd. ("Infosys") "poached"

certain Acclaim employees and subcontractors by inducing them to work for Infosys, and

thereby violate non-compete clauses in their employment agreements with Acclaim.  A second

defendant, VedaInfo, Inc. ("VedaInfo"), allegedly facilitated this poaching.  VedaInfo previously

filed a motion to dismiss the claims against it, which the Court granted in part as to the claim that

VedaInfo aided and abetted the breach of contract, but denied otherwise.  *See Acclaim Sys., Inc.

v. Infosys, Ltd.*, No. CIV.A. 13-7336, 2015 WL 4257463 (E.D. Pa. July 14, 2015) (hereinafter

*Acclaim I,* at __).  Subsequently, the parties dismissed the remaining claims against VedaInfo by

stipulation.

Infosys now moves for summary judgment on the remaining claims.  There are currently

three active counts against Infosys: (1) Tortious Interference with a Contract (Count I of the First

Amended Complaint); (2) Aiding/Abetting/Inducing Contractual Breaches (Count II); and (3)

Civil Conspiracy (Count V).  For the reasons outlined below, the Court will grant Infosys's

motion as to each of these claims.

## I.   FACTUAL BACKGROUND[1]

Acclaim is a U.S.-based provider of information technology ("IT") services.  Infosys is

an India-based competitor of Acclaim in the IT sector.  Prior to 2013, the time period at issue in

this lawsuit, both companies had provided IT consulting services to Time Warner Cable

("TWC"). The dispute between the parties centers on consulting work related to the

implementation of a particular software platform, Sales Force Dot Com ("SFDC"), performed by

both companies for TWC.  SFDC is a customizable[2] client relationship management tool which

companies can use to assist them with customer service.

As of spring 2013, TWC's existing IT service providers on the SFDC project were

Acclaim and Acumen, a third party not involved in this litigation.

In March 2013, Jim Wilkinson, Manager of IT Operations at TWC's location in

Charlotte, North Carolina, contacted Rajagopal Ramen, the Associate Manager of Client

Services at Infosys, who was in charge of managing Infosys's existing engagements with TWC.[3]

---

[1] In conjunction with filing its motion for summary judgment, Infosys filed a statement of undisputed facts ("Def. SUF at ¶ __"), which is docketed at Doc. Nos. 21-3 and 70.  Acclaim filed a response admitting, denying or objecting to these facts ("Pl. Resp. SUF at ¶ __"), which is docketed at Doc. No 73.  The following factual background is culled from the undisputed facts that Acclaim has either admitted, or for which Acclaim has failed to provide counter citations to the record.

[2] While examples of the use of this word date as early as 1960, "customizable" joined the ranks of vocabulary included in the Oxford English Dictionary in March 2012, presumably to facilitate IT marketing efforts. *See Customizable, adj.,* Oxford English Dictionary (3d ed. Dec. 2015), *online version available at* http://www.oed.com/view/Entry/256085.

[3] Throughout Acclaim's responses to the Infosys statement of undisputed facts, Acclaim makes repeated objections, not to the underlying substance of the testimony, but rather to its character as hearsay.  This raises two questions: first, are the statements at issue in fact hearsay, and second, may the Court nevertheless consider them for purposes of the summary judgment motion.

"In this circuit, hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial." *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) (citing *Shelton v. Univ. of Med. & Dentistry of N.J.,* 223 F.3d 220, 223 at n. 2 (3d Cir.2000)). Therefore, to the extent that any of the statements contained in the Infosys statement of undisputed facts constitute hearsay which would be inadmissible at trial, the Court will not consider them for purposes of summary judgment.   For example, Mr. Raman's testimony as to what Jim Wilkinson, Manager of IT Operations at TWC told him regarding TWC's intentions, is hearsay without an apparent exception.  *See* Def. SUF at ¶ 12.  Conversely, statements made by Jim Wilkinson or Frank Boncimino in email correspondence would be admissible if these individuals themselves testified at trial. *See* Def. SUF at ¶ 17.

Many of Acclaim's objections, however, relate to statements which are not assertions presented for the truth of the matter asserted but rather verbal acts or evidence tending to show the listener's understanding and intention.  *See Marks v. Marina Dist. Dev. Co.*, LLC, 213 F. App'x 147, 153 (3d Cir. 2007).  For example, the fact

In April 2013, in response to this call, Mr. Ramen submitted to Mr. Wilkinson a PowerPoint presentation titled "Infosys Salesforce.com Credentials," which described Infosys's capabilities and experience regarding SFDC.  Infosys had over 300 SFDC practitioners within its organization and was recognized by Salesforce Inc., the creator of SFDC, as a "premier consulting partner." Def. SUF at ¶ 10.

In May 2013, TWC's chief information officer in Charlotte, Frank Boncimino, sent an email to his commercial team, instructing them that TWC was moving the SFDC project from Acclaim and Acumen to Infosys.

In June 2013, Mr. Wilkinson scheduled a meeting between TWC and Infosys personnel to discuss the transition of the TWC SFDC project.  One of the Infosys employees who participated in this meeting was Raj Srinivasan.  Mr. Srinivasan would serve as Infosys's project manager for the SFDC project and was responsible for putting together the Infosys team of IT consultants who would do the work.  As per Infosys's global delivery model, the company expected that most of these consultants would be stationed "off-shore" in India with only a few placed "on-shore" at the TWC site in Charlotte.

Infosys's official involvement with the SFDC project began on July 1, 2013.  As of that date, Infosys anticipated a six to eight week transition phase which would allow Infosys to complete a "knowledge transfer" necessary to get up to speed on the project.  Infosys initially proposed using two Infosys consultants on-site in Charlotte: Mr. Srinivasan and Sunil Ramachandra, an Infosys IT consultant.  The remainder of the team was to be based in India.

Prior to Infosys's involvement in the project, four consultants–Timothy Blackwell, Santhosh Nellutla, Pavan Jasthi, and Leslie Mendonca–were already working on the SFDC

that Robin Jackson was contacted by Jim Wilkinson is not hearsay.  *See* Def. SUF at ¶ 11.  Similarly, testimony regarding Infosys's representatives' understanding of TWC's intentions in reaching out to them is not hearsay.  *See* Def. SUF at ¶ 13.

project for Acclaim.  Mr. Blackwell was employed directly by Acclaim while the three others were subcontractors who Acclaim had retained through third party entities: Mr. Nellutla and Mr. Jasthi were employed by Global Infotech, Inc. ("Global") and Mr. Mendonca was employed by SysIntelli, Inc. ("SysIntelli").[4]

In July 2013, Mr. Wilkinson approached Infosys and asked if Infosys would consider having the four Acclaim subcontractors remain on the SFDC project after Infosys took over.  In an attempt to accommodate TWC's request, Infosys agreed to look into hiring these individuals to work on the project.  On July 11, Mr. Srinivasan received resumes from Messrs. Nellutla, Jasthi and Mendonca.  Infosys's original plan, however, was not to use the four subcontractors once the initial knowledge transfer phase of the project was complete.

Mr. Srinivasan testified at his deposition that there are two ways IT consultants may come to work for Infosys: they may be hired by Infosys directly as employees or they may be "routed to" Infosys as subcontractors through an Infosys approved vendor.  When Infosys considers an individual as a potential employee, the candidate is interviewed by Infosys human resources personnel.  The process includes a background check and questioning as to whether any non-compete agreements or other restrictive covenants would prevent or impede the applicant from working at Infosys.  In general, Infosys prefers to staff its customer engagements with Infosys employees rather than third party consultants.

Infosys eventually decided that the three subcontractors who were employed by Global and SysIntelli would continue to be employed by those companies due to uncertainty about their immigration status.  Neither Global nor SysIntelli, however, had subcontracting agreements in place with Infosys and were not approved Infosys vendors.  Consequently, Infosys used a third

---

[4] Hereafter, these four individuals will be referred to collectively as the "Acclaim subcontractors."  The subset of Messrs. Nellutla, Jasthi and Mendonca will be referred to collectively as the "H-1B subcontractors"

subcontractor, VedaInfo Inc., as a conduit to bring Messrs. Nellutla, Jasthi and Mendonca onto the TWC project.  VedaInfo was responsible for performing the necessary due diligence and supplying the subcontractors to Infosys.  A full background report on the H1-B subcontractors was scheduled to be delivered by VedaInfo to Infosys on October 30, 2013.

Whether VedaInfo's due diligence included explicit inquiry into restrictive covenants the H-1B subcontractors may have been subject to is disputed.  Mr. Srinivasan testified, however, that prior to bringing the three H-1B subcontractors onto the project, he spoke with each and asked them whether they were subject to restrictive covenants.  Mr. Srinivasan also testified that he spoke with representatives of Global and SysIntelli.  Neither company gave Infosys "any information on their commitments of 18 months or dollar amount involved in paying to Acclaim," and, according to Mr. Srinivasan, "there was no reason for [Infosys] to be concerned about any arrangements these individuals [had] with their employers or Acclaim."  Pl. Resp. SUF at ¶ 47 (citing Srinivasan Dep. at 256-57[5]).

Unlike the three H-1B subcontractors, Mr. Blackwell had been an employee of Acclaim previously and applied for employment directly with Infosys. Mr. Srinivasan testified that Mr. Blackwell informed him, via email, that "I do not have a non-compete clause with Acclaim," and that the only constraint on his being an employee with Infosys was his obligation to give Acclaim two weeks' notice of his intent to resign.  *See* Srinivasan Dep. at 261.  Mr. Blackwell also filled out Infosys's online employment application, which included the question: "[a]re you subject to any contractual restrictions including non-competition or other obligations that could prevent you from working for [Infosys] in the role for which you have applied, including current and prior employer restrictive covenants?"  Mr. Blackwell responded "No."  Srinivasan Dep. at 208.

---

[5] Excerpts of the Deposition of Raj Srinivasan (Nov. 7, 2014) are docketed at Exhibit D to Doc. No. 21.

On September 4, 2013, Acclaim emailed Cyndee Everman, VP of Care, Sales/Retention & Telecom Solutions at TWC in Charlotte, to confirm TWC's cancellation of Acclaim's statement of work under which Acclaim had previously provided services to TWC for the SFDC project.  In accordance with Acclaim's consulting agreement with TWC, which applied to the statement of work for the SFDC project, TWC was permitted to cancel the contract at-will, provided TWC gave Acclaim 30 days' notice.  TWC did not breach its contract with Acclaim and TWC paid Acclaim for all the services Acclaim performed on the SFDC contract.

Slightly more than a week later, Acclaim emailed Global to terminate its purchase orders for Messrs. Nellutla and Jasthi's services and set September 30 as the subcontractors' last day of work on the project.  On September 27, the H1-B subcontractors were asked, by way of emails from Acclaim, to "comply with all the terms of the agreement signed by your firm and [not to] format or remove software, etc. from Acclaim's laptop[s]."  *See* Def. Ex. H at 39.[6]  The Acclaim representative did not say anything to the subcontractors about their employers' non-compete agreements with Acclaim.

The first day the subcontractors worked on the SFDC project through Infosys, rather than Acclaim, was October 1.  Mr. Jasthi, however, was on vacation in India throughout the month of October and never performed any work for TWC through Infosys.

On October 24, 2013 Acclaim filed a lawsuit in the Bucks County, Pennsylvania Court of Common Pleas against Mr. Blackwell, Global and SysIntelli for breach of contract and tortious interference.   In response, Infosys asked Mr. Blackwell to explain the representations he had made on his employment application stating that he was not subject to any restrictive covenants. It was during this conversation that Mr. Blackwell first informed Infosys that he had entered into a non-compete agreement with Acclaim in 2008.

---

[6] Exhibit H is docketed as an attachment to Doc. No. 21.

On November 19, 2013, Mr. Wilkinson informed Mr. Ramen that TWC had decided to cancel Infosys's involvement in the SFDC project and afterward moved in-house all work on the SFDC project.  Infosys's involvement in the SFDC project officially ended November 30, 2013.  Both Infosys and Acclaim still provide other IT services to TWC in Charlotte.  In addition, as a result of his apparent misrepresentations, Infosys terminated Mr. Blackwell's employment on December 31, 2013.

## II.    COUNTS II AND V

Three counts remain in this litigation against Infosys, and Infosys moves for summary judgment on all three.  The Court will deal with Counts II and V first.

Count II alleges that Infosys is liable for aiding and abetting a breach of contract.  The Court has already held, however, that aiding and abetting a breach of contract is, in and of itself, not a tort recognizable in Pennsylvania.  *Acclaim I,* at *5.[7]  In analyzing Acclaim's claims against VedaInfo, the Court noted that "Acclaim has not cited any authority for the notion that aiding and abetting a breach of contract is a tort recognized in Pennsylvania. Pennsylvania law only recognizes aiding and abetting liability if there is underlying tortious conduct." *Id.* (citing *Austin v. Hill*, No. 11-2847, 2014 WL 1386338, at *13 (E.D. Pa. April 9, 2014)).

---

[7] In *Acclaim I,* the Court evaluated both Pennsylvania and North Carolina law and held that Pennsylvania law should apply with regards to both the Plaintiff's tortious interference claims as well as its civil conspiracy claims.  Under either Pennsylvania or North Carolina law, the elements to be applied were the same.  *Acclaim I,* at *7-8.  "[T]he first step in a choice of law analysis under Pennsylvania law is to determine whether a conflict exists between the laws of the competing states. If no conflict exists, further analysis is unnecessary." *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 229 n.7 (3d Cir. 2007) (*citing Budtel Assoc., LP v. Continental Cas. Co.*, 915 A.2d 640, 641 (2006)).

Both the Plaintiff and Defendant have stated in their briefing that they agree with the Court's choice of law analysis laid out in *Acclaim I* and agree that Pennsylvania law applies to both the tortious interference and civil conspiracy counts at issue in this motion.  *See* Def. Memo at 14; Pl. Memo at 14.

Finally, while the issue was not directly addressed in *Acclaim I,* the Court now also expressly notes that it has found no authority to suggest that aiding and abetting breach of contract is a tort recognized in North Carolina, either.  *See Krawiec v. Manly*, No. 15 CVS 1927, 2016 WL 374734, at *15 (N.C. Super. Jan. 22, 2016).  As a result, there is no conflict of law necessitating further analysis.

In its briefing, Acclaim states that it disagrees with the Court's previous ruling on this issue, but does not present any counter-argument or authority to support a finding that Count II states a claim under either Pennsylvania or North Carolina law. Rather, Acclaim simply states that it preserves its contrary view for appellate proceedings. Consequently, for the reasons outlined in *Acclaim I*, the Court will grant the Infosys motion for summary judgment as to Count II as essentially unopposed and substantively required by the law of the case. Acclaim is, of course, left to pursue its appellate options.

As to Count V, Acclaim has stated in its briefing that it is withdrawing this count against Infosys. Pl. Memo at 24.[8] Consequently, the Court will grant the Defendant's motion as to this count as well.

### III.    COUNT I: TORTIOUS INTERFERENCE

Therefore, the only remaining dispute of substance relates to Acclaim's tortious interference claim.

#### 1.   Standard of Review

A court shall grant summary judgment if a party shows that there is no genuine dispute as to a material fact and that the party is entitled to judgment as a matter of law. *See* Rule 56(a). "This occurs where a party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

---

[8] Acclaim explains that it is withdrawing its civil conspiracy claim based upon VedaInfo's representative's sworn testimony to the effect that VedaInfo was unaware of Acclaim's existence prior to the initiation of the litigation. *See* Pl. Memo at 24. Establishing a civil conspiracy requires the plaintiff prove the existence of "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuit of the common purpose, and (3) actual legal damage." *Phillips v. Selig*, 2008 PA Super 244, 246, 959 A.2d 420, 437 (2008); *accord Batoff v. Charbonneau*, No. CV 14-6879, 2015 WL 5460571, at *10 (E.D. Pa. Sept. 16, 2015) (citing *Strickland v. Univ. of Scranton*, 700 A.2d 979, 987–88 (Pa.Super.Ct.1997)). In order to prove Count V, therefore, Acclaim must show that Infosys and VedaInfo conspired to interfere with Acclaim's relationship with TWC or Acclaim's relationship with Global Infotech, SysIntelli and Mr. Blackwell. Assuming VedaInfo was unaware of the very existence of Acclaim prior to the lawsuit, its personnel, acting on its behalf, would not have been able to form the requisite intent to enter into the conspiracy. And without VedaInfo's participation, Infosys had no co-conspirator. Hence, there can be no conspiracy claim.

trial.'" *Freeman v. Miller*, 615 F. App'x 72, 75 (3d Cir. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).)  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In addition, the dispute must be "genuine", which means that there must be more than some metaphysical doubt as to the material facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citing *DeLuca v. Atlantic Refining Co.*, 176 F.2d 421, 423 (2d Cir 1949) (L. Hand, J.), *cert. denied*, 338 U.S. 943, (1950).  Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.  *Id.* (citing *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)).

On a motion for summary judgment, the moving party bears the burden of identifying the specific parts of the record which establish the absence of a genuine issue of material fact. *Santini v. Fuentes,* 795 F.3d 410, 416 (3d Cir. 2015) (citing *Celotex,* 477 U.S. 323).  Once the moving party has met this burden, however, the nonmoving party must then come forward with specific competing facts in the record showing that there is a genuine issue for trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In evaluating the record evidence identified by the parties, the Court must construe all evidence in the light most favorable to the nonmoving party.  *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  Nevertheless, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Crawford v. Miller*, 269 F. App'x 178, 180 (3d Cir. 2008) (quoting *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006)).

### 2. Discussion

Under Pennsylvania law, Acclaim's suit against Infosys for tortious interference with an existing contract requires the satisfaction of four elements: (1) the existence of a contract between Acclaim and a third party, (2) the intent on the part of Infosys to harm Acclaim by interfering with that contractual relationship, (3) the absence of a privilege or justification on the part of Infosys for such interference, and (4) actual damages suffered by Acclaim as the result of Infosys's conduct.  *See Burton v. Teleflex Inc.*, 707 F.3d 417, 433 (3d Cir. 2013); *Acumed LLC v. Advanced Surgical Servs.*, *Inc.*, 561 F.3d 199, 212 (3d Cir. 2009); *BP Envtl. Servs., Inc. v. Republic Servs., Inc.*, 946 F. Supp. 2d 402, 407 (E.D. Pa. 2013).  In its motion for summary judgment, Infosys argues that, based upon the record established in discovery, Acclaim is unable to prove the second, third, and fourth elements of the tort.  Def. Memo at 15.

### A.  Knowledge of the Existence of the Non-Compete Clauses

First and foremost, tortious interference with a contractual relationship is an intentional tort: "[t]he defendant must not only have intended the interference, but must have acted in part at least for the purpose of accomplishing it."  *Glenn v. Point Park Coll.*, 441 Pa. 474, 481, 272 A.2d 895, 899 (Pa. 1971).  As a prerequisite of establishing the existence of such intent, however, the plaintiff must establish the defendant's knowledge of the contract he or she is being accused of interfering with.  *See* Restatement (Second) of Torts § 766, Comment (i). As the comment to the Restatement makes explicit:

> To be subject to liability under the rule stated in this Section, the actor must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract. Although the actor's conduct is in fact the cause of another's failure to perform a contract, the actor does not induce or otherwise intentionally cause that failure if he has no knowledge of the contract.

Restatement (Second) of Torts § 766 (1979).

Based upon the record developed during discovery, there does not appear to be any direct evidence that Infosys was aware that Mr. Blackwell, or any of the H1-B subcontractors, were subject to non-compete agreements until after the state litigation was initiated in Bucks County. *Compare* Def. SUF at ¶ 45 *with* Pl. Resp. SUF at ¶ 45.

In fact, as to each of the subcontractors, there is evidence in the record to the effect that Infosys was told affirmatively the subcontractors were *not* subject to any contractual restrictions on their ability to work for Infosys. Acclaim does not dispute that when Mr. Srinivasan spoke with the three H-1B subcontractors, and asked them individually whether they were subject to any non-compete agreements, each of them stated that they were not subject to any contractual restrictions. Def. SUF at ¶ 45; Pl. Resp. SUF at ¶ 45. In addition to speaking with these subcontractors, Infosys also approached the subcontractors' H-1B sponsors, Global and SysIntelli, and "asked them if they are willing to work through us, through Infosys to represent— have them still continue working at Time Warner", and these companies "did not give [Infosys] any information on their commitments of 18 months or dollar amounts involved in paying to Acclaim." Pl. Resp. SUF at ¶ 45 (citing Srinivasan Dep. at 256:13-16, 18-20). With regards to its former employee, Mr. Blackwell, Acclaim admits that Mr. Blackwell stated explicitly in an email to Infosys that he was not subject to a non-compete agreement and that his only constraint on becoming an employee of Infosys was his obligation to give Acclaim two weeks' notice of his intent to resign. *See* Pl. Resp. SUF at ¶¶ 65, 66.[9] Moreover, the record in this case demonstrates that all potential employment candidates at Infosys fill out an employment application which includes a question as to whether the candidate is subject to a restrictive covenant which would

---

[9] While Acclaim responds in its counter-statement of facts that it disputes this statement, Acclaim provides no counter citation. Acclaim simply argues that this statement is hearsay. Here, the statement at issue is relevant not for the truth of the matters asserted in it but rather because the existence of the statement itself would have had an impact on the behavior of the recipient, Mr. Srinivasan. Indeed, the fact that Mr. Blackwell was actually subject to a non-compete agreement is not disputed. For this purpose, the statement is not hearsay under Rule 801(c)(2).

prevent him or her from working on the relevant project.  *See* Def. SUF at ¶ 133; Pl. Resp. SUF at ¶ 133 (providing no counter citation to the record to dispute this fact).

Thus, the available evidence satisfies the Court that Infosys inquired into the status of the subcontractors at the time they were brought to Infosys and that Infosys was not informed that the Acclaim subcontractors were subject to any contractual restrictions.  The record also supports the conclusion that Infosys believed it was reasonable to accept the representations of the Acclaim subcontractors and of their H-1B sponsors. Indeed, Acclaim does not dispute that its own president, Kailash Kalantri, testified that he has accepted as true the same types of personal representations made to him by subcontractors and potential employees.  *See* Def. SUF at ¶ 46; Pl. Resp. SUF at ¶ 46.

Nevertheless, despite this evidence, Acclaim argues that circumstantial evidence in the record has established a genuine issue of material fact regarding Infosys's intent to interfere with Acclaim's contracts.  Acclaim also argues that the record supports the conclusion that Infosys was "willfully blind" to the existence of these covenants.  Neither argument is compelling.

### i.   Circumstantial Evidence of Intent

In its briefing, Acclaim points to a collection of facts which it alleges amount to circumstantial evidence of Infosys's knowledge of, and ultimately intent to interfere with, Acclaim's contracts.  Even taken in the light most favorable to Acclaim, however, this evidence could show, at most, that Infosys acted negligently (rather than with intent) with regards to the contracts at issue.

Acclaim contends that the record shows that Infosys must have had constructive knowledge of the restrictive covenants in the Acclaim subcontractors' contracts because such

covenants were standard in the industry.  Pl. Memo at 19.[10]   Acclaim's Mr. Kalantri, testified

that "everybody has [a non-compete] agreement" because "it's like a common policy."  *See*

Kalantri Dep. at 90-91.[11]  Infosys, however, asserts that such restrictive covenants are not

universal and cites testimony of Raj Srinivasan.  Mr. Srinivasan testified that he was not required

to sign a non-compete agreement while working for Kellogg Brown & Root as an application

manager dealing with Oracle software prior to his employment with Infosys.  Srinivasan Dep. at

15-17.  Acclaim provides no counter-authority but instead disputes the relevance of Mr.

Srinivasan's testimony because Acclaim asserts he was not working for an IT consulting firm.

*See* Pl. Resp. SUF at 50.

 While the parties dispute whether the inclusion of restrictive covenants in employment

contracts was standard practice in the IT consulting industry, this does not appear to be a

material issue.  Construing all evidence in a light most favorable to Acclaim, the evidence

regarding the prevalence of restrictive covenants in the industry simply establishes that Infosys

would be aware that restrictive employment clauses are common among IT consultants and

subcontractors.  This alone, however, does not create a dispute of material fact as Infosys's

actual knowledge that the four subcontractors at issue were under such restrictions.  Moreover,

the testimony from Infosys's witnesses is consistent with the company being aware that

restrictive convents *were* common in the industry and, therefore, was cognizant of the need to

investigate whether the Acclaim subcontractors Infosys wished to hire were subject to such

covenants.  *See* Def. SUF at ¶¶ 42-51.  Infosys did so.  Acclaim does not dispute that inquiries

were made or that Infosys was not told by the subcontractors or their employers that they would

---

[10] Preliminarily, Acclaim alleges that Infosys had actual knowledge of the existence of contracts between the subcontractor resources and the client, TWC.  This does not appear to be in dispute.  *See* Def. SUF at ¶ 31.  But this does not resolve the issue at hand, of course.
 [11] Excerpts of the Deposition of Kailash Kalantri (Oct 16, 2014) are docketed at Exhibit C to Doc. No. 21.

be unable to work with Infosys due to restrictive non-compete agreements.[12]   Acclaim's

argument, rather, is that under the circumstances, these inquiries were insufficient. *See* Pl. Memo

at 18.  Acclaim does not suggest what inquires would be deemed sufficient.

Acclaim also contends that Infosys's reliance on VedaInfo constituted "sham" due-

diligence, and that this is evidence of Infosys's intent to interfere with Acclaim's contracts.

Acclaim argues that Infosys purposefully kept VedaInfo in the dark regarding the subcontractor's

prior work with Acclaim. *See* Pl. Memo at 20.  Acclaim points out that the VedaInfo contract did

not explicitly state that it was required to inquire into the existence of the Acclaim

subcontractor's non-compete agreements and that VedaInfo was unaware prior to the lawsuit that

Acclaim had been involved in the TWC project.  *See* Pl. Memo at 17; Pl. Resp. SUF at ¶ 57.

This does not change the fact that, among other things, the contract required VedaInfo to confirm

the "the veracity of each Representatives' claims in relation to educational qualifications and

work/job experience." Def. Ex. G. at 19.

Similarly, Mr. Srinivasan testified that, if subcontractors are being hired through a

vendor, the expectation on the part of Infosys is that the vendor will do a background check

comparable to the background check Infosys would do itself if the individuals were being hired

by Infosys directly.  *See* Srinivasan Dep. at 103.  While Acclaim has elsewhere argued, without

record support, that Mr. Srinivasan's testimony should be discounted because he is

---

[12] Acclaim argues that Infosys's procurement department instructed the Infosys team to investigate whether the Acclaim subcontractors were subject to non-compete clauses and that Infosys "censured" the team for failing to uncover these contracts.  *See* Pl. Memo at 17.  Nevertheless, Acclaim admits that Infosys contacted the individual subcontractors and asked whether they were subject to any restrictive covenants which would prevent them from working through Infosys on the TWC project and that Acclaim, in fact, had no contractual relationship with the subcontractors.  *See* Pl. Resp. SUF at ¶ 46.  The record also shows that Infosys contacted the subcontractors' H-1B sponsors and inquired into whether they were willing to work with Infosys to continue supplying these individuals to the TWC project.  *See* Srinivasan Dep. at 256-257.  In response to this inquiry by Infosys, the H-1B sponsors "did not give [Infosys] any information on their commitments of 18 months or dollar amount involved in paying to Acclaim."  Pl. Resp. SUF at ¶ 47 (citing Srinivasan Dep. at 257).  Acclaim cites to no contradictory facts.  *See* Pl. Resp. SUF at ¶ 47.  Consequently, the Court finds that there is no genuine dispute that Infosys inquired into the H-1B's ability to supply the subcontractors to Infosys on the TWC project.  As discussed *infra*, Acclaim's argument that Infosys's inquiry was deficient or too limited lacks any legal support and ultimately is not compelling.

untrustworthy, *see* Pl. Resp. SUF ¶ at 57, Acclaim provides no evidence contradicting this testimony regarding Infosys's expectation under the contract. The only other record evidence cited by Acclaim demonstrates that VedaInfo's general responsibilities included verifying the subcontractors' ability to work on the project that went beyond simple criminal background checks and collection of documentation. *See* Pl. Resp. SUF at ¶ 55 (citing INFOSYS000040, 000504 and Ex. C[13] to Doc. No. 70 at ¶¶ 2, 16).

The only possible inference one can reasonably draw from the evidence cited by Acclaim is that Infosys was operating on the assumption that VedaInfo was responsible for conducting a background check of the H-1B subcontractors and that Infosys relied upon VedaInfo's due diligence process. *See* Def. SUF at ¶ 57 (citing Srinivasan Dep. at 103). Acclaim has provided the Court with no basis to conclude that VedaInfo's process was deficient, that Infosys was under any obligation to do more due diligence than what Acclaim admits Infosys did, or that it was unreasonable for Infosys to rely on VedaInfo. Without more, there is no rational basis to infer Infosys's agreement with VedaInfo was part of some conspiratorial plot, rather than the result of Infosys's vendor approval policy.

The predicate necessary to establish the relevance of all the facts highlighted by Acclaim would be a finding that Infosys had a duty, not only to inquire into the contracting-status of their potential subcontractor hires, but to go beyond taking them at their word and actually and independently verify the existence and terms of any possibly applicable restrictive covenants. Acclaim's action based upon Infosys's failure to do so here amounts to a claim of negligent interference with a contractual relationship. Under Pennsylvania law there is no such tort. *Aikens v. Baltimore & Ohio R. Co.*, 501 A.2d 277, 278 (Pa. Super. 1985) ("One is not liable to

---

[13] Exhibit A to Doc. No. 70 is VedaInfo's Response to Plaintiff's Rule 31(a)(1) Written Deposition Questions. Although Acclaim cites to "Exhibit C", this appears to be a typo. The Court assumes that the intended reference is to Exhibit A.

another for pecuniary harm not deriving from physical harm to the other, if that harm results from the actor's negligently causing a third person not to perform a contract with the other."); *Local Joint Executive Bd. of Las Vegas, Culinary Workers Union, Local No. 226 v. Stern*, 651 P.2d 637, 638 (Pa. 1982) ("The well-established common law rule is that absent privity of contract or an injury to person or property, a plaintiff may not recover in negligence for economic loss."); *Duquesne Light Co. v. Pennsylvania American Water Co.*, 850 A.2d 701, 703 (Pa. Super. 2004); *Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc.*, 28 F. Supp. 2d 947, 952 (E.D. Pa. 1998) ("There is no general cause of action in Pennsylvania for negligent interference with contractual relations.").

As the Court explained in *Fisher Bioservices, Inc. v. Bilcare, Inc.*, No. CIV.A. 06-567, 2006 WL 1517382, at *19 (E.D. Pa. May 31, 2006), a defendant can take a potential employee's reasonable representations that she is not subject to a non-compete agreement at face value.  In *Fisher Bioservices,* the Court ruled on a motion for a preliminary injunction against a plaintiff's former employee and a competitor.  The defendant employee in *Fisher Bioservices* had been subject to a non-compete agreement with the plaintiff but had nevertheless interviewed with, and subsequently started working for, a competitor while this restrictive covenant was in force. Among other things, the plaintiff argued the competitor was liable for tortious interference with the non-compete agreement.   Much like here, the factual record in *Fisher Bioservices* showed that the employee had been asked by the competitor-defendant whether she was subject to a non-compete agreement and she had responded in the negative.  *Id.*  The testimony from the competitor-defendant corroborated the defendant's ignorance of any restrictive covenants.  *Id.*  In light of this, the Court held that the plaintiff was unlikely to succeed on the claim.

Ultimately, the Court finds that Acclaim has not pointed to any circumstantial evidence that Infosys intended to interfere with the relevant contractual relationships.[14]

### ii.    Willful Blindness

Acclaim also cites to three opinions to support its argument that intent to interfere with the terms of a contract can be inferred when a defendant exhibits "willful blindness" to the consequences of its actions.  None of the opinions Acclaim cites are persuasive here.

The primary opinion Acclaim hopes to invoke is *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413 (3d Cir. 2013).  Acclaim's reading of this case, however, is flawed.   In *Mylan*, a licensee filed a breach of contract claim against a patent owner, claiming that the owner violated the licensing agreement by selling to the licensee's competitor.  The plaintiff also sued the competitor for tortious interference with its contracts.  The Third Circuit Court of Appeals upheld summary judgment for the competitor-defendant, finding that—much like in this case—the record established that the competitor never saw the agreement at issue and was not aware of the specific terms contained within it.  After holding that summary judgment was warranted, the court considered whether willful blindness as to the specifics of an existing contract could satisfy the intent requirement.  Ultimately, however, the appellate court rejected this argument, explaining in dicta that "[g]eneral knowledge of a business relationship is not sufficient; the

---

[14] Perhaps recognizing that the record does not establish Infosys's knowledge of, let alone intent to interfere with, the restrictive covenants in the subcontractor agreements, Acclaim also argues that such knowledge is "relevant" but not dispositive because the claim is not limited to interference with the subcontractors' restrictive covenants.  Pl. Memo at 21. Acclaim does not identify which potential other contracts it alleges form the basis of its claim or provide any explanation of the manner in which Infosys has tortuously interfered with them.  The best that the Court can divine, Acclaim is arguing that Infosys should be held liable for successfully competing for the SFDC project.  Putting aside the fact that this contradicts one of the bedrock principles of American market economics, Acclaim presents no legal support for such an argument and no factual basis to support such a position.  Moreover, as Infosys points out, Acclaim's owner and president testified that Acclaim was not alleging that Infosys tortuously interfered with the TWC/Acclaim consulting agreement.  As is well recognized, summary judgment is "put up or shut up time" for the plaintiff, *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir.2006); *Viccharelli v. Home Depot U.S.A., Inc.*, No. CIV.A.06-4890, 2007 WL 4276657, at *1 (E.D. Pa. Dec. 4, 2007), and its claims cannot survive based purely on unsubstantiated and unsourced assertions regarding general competition with Acclaim's business.

defendant must have specific knowledge of the contract right upon which his actions infringe." *Id.* at 422 (citing *DiGiorgio Corp. v. Mendez & Co.*, 230 F. Supp. 2d 522, 564 (D.N.J. 2002). Moreover, the court found that even if it were to impute knowledge to the defendants, the plaintiff still must prove that the defendants acted with malice and that "where the parties to a tortious interference claim are business competitors—such as Mylan and Apotex—establishing intentional and malicious interference requires evidence that one competitor interfered with another's economic advantage through conduct which was fraudulent, dishonest or illegal." *Id.* at 422-23.  There, as here, the record did not establish that the defendants' conduct was actionable.  *See* Section III.B, *infra.*

The other two opinions cited by Acclaim explain that intent to commit a tort generally can be inferred when the consequences of an action are substantially certain to occur.  *See* Pl. Memo at 20 (citing *Field v. Philadelphia Electric Co.*, 388 Pa. Super. 400, 565 A.2d 1170 (Pa. Super. 1989) and *B.T.Z. Inc. v. Grove*, 803 F. Supp. 1019 (M.D. Pa.1992)).  These cases are not helpful, however, insomuch as they presuppose the defendant's knowledge of the consequences of his actions.  In *Field v. Philadelphia Electric Co*, the Pennsylvania Superior Court held that the venting of radioactive steam could be actionable as a battery.  *See* 388 Pa. Super at 417, 565 A.2d at 1178. The court assumed, however, for purpose of the motion to dismiss, that the defendants were aware of the plaintiff's location relative to where the steam was released and aware of its harmful character.  This case is unhelpful here, given that it is the defendant's knowledge of the harmful character of his conduct which has not been established on this record.

*B.T.Z. Inc. v. Grove* is similarly unhelpful.  In that case, the court granted a motion to dismiss a tortious interference claim, finding that the plaintiff had failed to allege either intent to harm the plaintiff or substantial certainty that the plaintiff would suffer harm as a result of the

defendant's conduct.  803 F. Supp. at 1023-24.  Again, the standard articulated assumes the defendants' knowledge of the risk of harm.

Ultimately, neither of these decisions is illuminating.  Whether the Court can infer the Defendant's intent based upon the substantial certainty that actions would cause harm, this inference still requires, as a predicate, that Acclaim prove Infosys was aware of the non-compete clauses at issue. *See* Restatement (Second) of Torts § 8A (1965) (Illustration 1).  In essence, Acclaim is attempting to bootstrap the intent analysis by presupposing Infosys's knowledge of the non-compete clauses.  None of these cited opinions endorse such analytic leaps. Consequently, the Court finds that the authority identified by Acclaim does not articulate the principle that a defendant in a tortious interference action can be held liable on the basis of willful blindness in the absence of evidence that the defendant is aware of the terms of the breached contract.

Therefore, the record, taken in a light most favorable to Acclaim, does not create a genuine issue of material fact regarding Infosys's knowledge of a non-compete clause in the subcontractor's employer's contracts with Acclaim.  Because Acclaim is unable to prove the intent element of its tortious interference claim, Infosys is entitled to summary judgment on Count I.  *See Celotex*, 477 U.S. at 323; *In re Nat. Pool Constr., Inc.*, 598 F. App'x 841, 844 (3d Cir. 2015).

### B.  Justification for Infosys's Actions

As to the third element of tortious interference, Infosys argues that Acclaim will be unable to show the absence of a privilege or justification for Infosys's alleged interference with the contracts at issue.  "In the absence of some evidence that [the defendant] engaged in independently actionable conduct, it is shielded from liability by the competition privilege. . . ."

*Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 220 (3d Cir. 2009).  The presence of a privilege is not an affirmative defense; rather, the absence of such a privilege is an element of the cause of action which must be pleaded and proven by the plaintiff.  *Synthes, Inc. v. Emerge Med., Inc.*, No. CIV.A. 11-1566, 2014 WL 2616824, at \*19 (E.D. Pa. June 11, 2014); *Odyssey Waste Servs*, 2007 WL 674594, at \*11 (citing *Bahleda v. Hankison Corp.*, 323 A.2d 121, 122-23 (Pa.Super.1974).

> In order to determine whether a defendant's conduct was improper or unjustified, Pennsylvania courts apply the factors laid out in Section 767 of the Restatement (Second) Torts:

> > (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the party with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties.

*BP Envtl. Servs., Inc. v. Republic Servs., Inc.*, 946 F. Supp. 2d 402, 408 (E.D. Pa. 2013) (citing *Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 482 Pa. 416, 393 A.2d 1175, 1184 (1978)); *see Windsor Secs., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 663 (3d Cir.1993); *Strickland v. University of Scranton*, 700 A.2d 979, 985 (Pa. Super. 1997). Proper conduct in this context is "socially acceptable conduct that comports with the rules of the game which society has adopted. *Big Appel BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1382 (3d Cir. 1992). Additionally, the inquiry into the propriety of the interference is "closely intertwined" with the intention of the defendant to interfere with the contract.  *Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 933 (Pa. Super. 2013).

Acclaim's argument is that Infosys violated the "rules of the game" in the industry by hiring subcontractors away from a competitor by misrepresenting their capabilities to accomplish the SFDC project.  *See* Pl. Memo at 21-22 (citing *Empire Trucking Co., Inc., Reading Anthracite*

*Coal Co.*, 71 A.3d 923, 933-34 (Pa. Super. Ct. 2013)).  After securing the SFDC project, Acclaim asserts that Infosys had to scramble to hire the "super niche" Acclaim subcontractors away from Acclaim in order to make good on its promises to TWC.  Pl. Memo at 1; *see* Pl. Resp. SUF at ¶ 39.  Securing the SFDC project through fraud could qualify as wrongful conduct which would satisfy the third element of the tort.  *See BP Envtl. Servs*, 946 F. Supp. 2d at 410.  Based upon the record here, however, the Court cannot conclude that Acclaim has created a genuine question of fact as to whether Infosys's conduct was fraudulent or otherwise wrongful.

The record supports the conclusion that Infosys's decision to hire the Acclaim subcontractors was prompted by a request from TWC in July 2013.  *See* Def. SUF at ¶ 36; Pl. Resp. SUF at ¶ 36.  This, however, occurred *after* TWC decided to bring Infosys onto the SFDC project.  TWC first approached Infosys in March 2013, suggesting Infosys submit a bid for the work.  Def. SUF at ¶ 11.[15]  In April 2013, Infosys made an initial pitch for the business, which included an explanation of its experience working on multiple SFDC client engagements as well as the experience of the over 300 SFDC practitioners who worked at Infosys.  Def. SUF at ¶ 14. In May 2013, Frank Boncimino, TWC's chief information officer in Charlotte, sent an email to his team instructing them that work on the SFDC project would be transferred from Acclaim and Acumen to Infosys.  Def. SUF at ¶ 17.  Finally, in early June 2013, a meeting took place with TWC and Infosys personnel to discuss the transaction of the SFDC project to Infosys. Only after all this interaction did TWC request Infosys hire the Acclaim subcontractors.

After Infosys agreed to hire these subcontractors, according to Acclaim, the record contains emails and other documents that express Infosys's belief that the subcontractors possessed "super niche" skill sets which it would be difficult for Infosys to replace from the open

---

[15] As discussed in greater detail in footnote 3, *supra*, Acclaim's hearsay objections to statements made by TWC personnel to Infosys are admissible to the extent that they are not being made to establish the truth of the matter asserted.

market.  *See* Pl. Memo at 1-2 (citing INFOSYS 003878-81, 004407, 004408, 005276).  These emails and documents, however, do not establish that Infosys misrepresented its capacity to TWC, only that once Infosys agreed to proceed with the Acclaim subcontractors, their options were limited by that decision.  For example, in a July 25, 2013 email cited by Acclaim, the concern expressed by Infosys relates not to a realization that the company lacked the personnel necessary to complete the project but rather to the inability to hire the subcontractor's directly due to green card issues.  In relevant part, this July 25, 2013 internal Infosys email reads:

> [w]e have discussed with the incumbent TWC contractors for [sic] employment options with Infosys, but it doesn't seem to move fwd as expected, due to Green Card related issues.  I am afraid, we are left with only option of subcontracting them and [sic] get the required staffing done.  This was one of the customer requests before starting the work.

*See* Pl. Resp. SUF at ¶ 39 (citing INFOSYS005267).  Facing this issue, Infosys was unable to hire the subcontractors directly and consequently was left with the only option of subcontracting them through a third party vendor, such as VedaInfo.   Contrary to Acclaim's argument, this email does not support an inference that Infosys had misrepresented its capacity to TWC.

Making all inferences in Acclaim's favor, the Court cannot conclude that there is a genuine dispute of material fact regarding Infosys's lack of justification or privilege in hiring the Acclaim subcontractors.  While Acclaim argues that the existence of a privilege or justification is a matter best left to the jury because the inquiry is "more nuanced" and requires a "balancing of interests" and "choice of values," Pl. Memo at 23, the general nuance required in the analysis does not negate the possibility the Court may grant summary judgment when the Plaintiff has failed point to anything more than speculation and supposition in support of its position.  *See BP Envtl. Servs.,* 946 F. Supp. 2d at 409; *Odyssey Waste Services,* 2007 WL 674594, at *12. Nebulous nuance is simply not enough.  Having reviewed Acclaim's submissions here, it appears

that the arguments addressing privilege rest entirely on unfounded speculation regarding

Infosys's motivation.  Therefore, Infosys is also entitled to summary judgment based upon

Acclaim's failure to present evidence showing that it could satisfy the third element of Count I.

### C.  Damages

Finally, Infosys argues that it is entitled to summary judgment on Count I because

Acclaim cannot establish that it suffered any damages as a result of Infosys's conduct.  In order

to recover, Acclaim must establish damages flowing from Infosys's tortious interference with

each of the specific contracts at issue: "[a] person that is found to have tortuously interfered with

a contract is subject to liability to another for the pecuniary loss resulting to the other from the

failure of the third person to perform on the contract."  *Fisher Bioservices*, 2006 WL 1517382, at

*19; *Odyssey Waste Servs*., 2007 WL 674594, at *13.  Acclaim has provided a breakdown of its

alleged damages, which is included as Exhibit H to the summary judgment motion.  There are six

categories of damages listed: "Time Warner Cable Project", "Global Pullout-Prashant Putta",

"MD Bid Disqualification", "Lost Relationships and Stress", and "Punitive."  *See* Def. Ex. H at

36-37.  The Court will analyze each of these categories in turn.

The first category relates to damages suffered as a result of the loss of services by the

consultants on the TWC project.  The gross profit generated by the four consultants on the TWC

project, however, was not lost as a result of the contractors breaching their non-compete clauses

with Acclaim, but rather the result of TWC awarding the contract to Infosys.  While Acclaim

argues that it was harmed as a result of TWC awarding the SFDC contract to Infosys, it has

acknowledged that TWC did not breach the terms of that agreement, Pl. Resp. SUF at ¶ 70, and

Acclaim's president stated in a deposition that Acclaim is not alleging that it is pursuing tortious

interference claims pursuant to the TWC contract, Pl. Resp. SUF at ¶ 99.[16]  Acclaim argues that

a "jury is entitled to infer that, but for Infosys' interference, Acclaims' relationships with TWC

and the H-1B employers would have continued uninterrupted." Not only is this assertion made

without any citation to relevant factual or legal authority, the argument tacitly acknowledges that

Acclaim is attempting to recover damages for its loss of TWC business, not the loss of the

subcontractor's services. Acclaim points to no evidence in the record which establishes the value

of the subcontractors' services to Acclaim, independent of the lost TWC contract.

Acclaim fails to address Infosys's arguments regarding the remaining categories of

damages.  As to each, the available record fails to connect claimed damages to any wrongful

conduct.

The second category of damages relates to a fifth consultant, Prashant Putta, who was

employed by Global and who worked on an unrelated and unidentified project for Acclaim

during the time period in question.  Mr. Putta allegedly left Acclaim around the time it filed the

Bucks County lawsuit.  No explanation is provided as to what relation this has to Global's breach

of the Acclaim contracting agreement.  Therefore, there is no basis for the Court to conclude that

these damages are related to actionable conduct by Infosys.

The third category of damages relates to an allegation that Acclaim was disqualified from

participating in a bid for unrelated business because its SFDC team—of which the contractors at

issue were allegedly members—could not participate.  Looking at the pleadings, it is conceivable

that this claim could lead to recoverable damages, assuming that Global's breach of its

agreement with Acclaim prevented the subcontractors from performing the bid work for

---

[16] Even if Acclaim was pursuing a tortious interference claim based upon the TWC contract, the Court
would find, based upon the record, that Acclaim is unable to raise a genuine issue of material fact regarding these
damages.  TWC's contract with Acclaim was cancelable at will and the record does not create a genuine issue of
material fact as to whether any Infosys conduct was wrongful or not privileged.

Acclaim. However, Acclaim has not addressed this issue in its briefing, so the Court is left with only the pleadings. This is insufficient for purposes of defeating a motion for summary judgment. *Berckeley*, 455 F.3d at 201.

The fourth category of damages simply claims unspecified damages based upon "lost relationships and stress." Acclaim has pointed to no facts establishing such lost relationships or corporate "stress."

The final category of damages is punitive damages. In order to be entitled to punitive damages, Infosys's conduct must have been "outrageous" and done with "bad motive" or with "reckless indifference to the interests of others." *Reading Radio, Inc. v. Fink*, 833 A.2d 199, 214 (Pa. Super. 2003). While Acclaim subjectively believes Infosys acted outrageously, the record, as discussed above, does not support these assertions. Acclaim has not established that Infosys intended to interfere with—or was even aware of—the non-compete clauses at issue, nor has Acclaim presented evidence which shows Infosys's bad motives or reckless indifference. Consequently, the record lacks any material facts justifying the imposition of punitive damages.

## IV.   CONCLUSION

For the reasons outlined above, the Court will grant the motion for summary judgment. As to Count II and V, Acclaim has either withdrawn its claims or presented no argument against finding Infosys is entitled to summary judgment under the law of the case.

As to Court I, Infosys has presented argument and record evidence showing the absence of a question of material fact regarding three elements of the claim for tortious interference with Acclaim's contracts. Acclaim has failed to come forward with evidence from the record which rebuts this to provide a basis for the Court to find a dispute of material facts necessitating this

case go to a jury. Consequently, the Court also finds that Infosys is entitled to summary judgment as to Court I.

*      *      *

An appropriate Order reflecting the above will follow.

BY THE COURT:


<u>S/Gene E.K. Pratter</u>
GENE E.K. PRATTER
United States District Judge